In the Matter of DEAN WITTER REYNOLDS INC., Petitioner, v PHILIP ROSS, as Industrial Commissioner of the State of New York, et al., Respondents.

First Department, June 26, 1980

**APPEARANCES OF COUNSEL**

*Henry F. Minnerop* of counsel *(Brown, Wood, Ivey, Mitchell & Petty,* attorneys), for petitioner.

*Marian B. Scheuer* of counsel *(Amy Juviler* with her on the brief; *George D. Zuckerman* and *Robert Abrams, Attorney-General,* attorneys), for respondents.

*Richard O. Scribner* for Securities Industry Association, *amicus curiae.*

*Merrill J. Chapman* for Association of Investment Brokers, *amicus curiae.*

**OPINION OF THE COURT**

BIRNS, J.

In this transferred CPLR article 78 proceeding, the petitioner (Dean Witter Reynolds, Inc.—DWR) seeks review and vacatur of a determination of the respondent Industrial Board of Appeals of the Department of Labor (the Board), entered November 29, 1978, which affirmed, after a *de novo* proceeding, an order of the respondent Philip Ross (Industrial Commissioner of the State of New York—the Commissioner), dated May 9, 1978. The order of the Commissioner determined that certain unlawful deductions had been made by DWR from the wages of a former employee, James Costello. The Commissioner directed that reimbursement should be made and that the practice of making such deductions should cease. This proceeding was transferred to this court by order of Special Term, entered November 29, 1979.

DWR is a large securities and commodities brokerage firm. It has clients throughout the United States and in foreign countries. The accounts are generally served by account executives in local branch offices.

DWR has approximately 3,500 account executives who are

responsible for client accounts. The account executives are generally required to be college graduates and receive extensive training by DWR in regard to the securities business. Upon successful completion of several examinations, the account executive trainees are eligible to be licensed as brokers.

Account executives must be competent to serve clients' needs and able to develop proper investment strategies for varied clients. DWR is legally responsible for the actions of account executives but they enjoy a large degree of professional freedom in their activities and dealings with clients.

James Costello was employed by DWR from May 1, 1971 through December 3, 1976. He was first employed as an account executive trainee, then as an account executive and finally as an assistant manager and assistant vice-president. Costello attended the DWR training school, passed all required examinations and became duly licensed as a stock and commodity broker in New York and elsewhere.

Costello was assigned to DWR's branch office in Garden City, Long Island. He worked in Garden City for his entire five years with DWR and then left to work for a competitor.

By 1976 Costello was earning $40,000 a year. He had clients in New York and eight other States.

DWR's revenues are principally derived from commissions and mark-ups in connection with specific securities and commodities transactions. Commissions are earned when DWR acts as an agent on behalf of its clients; mark-ups when it acts as a dealer or principal buying from or selling to its clients or other persons.

Under DWR's compensation program, Costello received a guaranteed monthly salary which ranged from $1,100 to $1,200. In addition to the salary, Costello was eligible to receive "incentive compensation" which depended on his productivity and the profitability to DWR of the business which he generated. During his employment by DWR, Costello consistently received incentive compensation in amounts substantially in excess of his monthly salary.

The incentive compensation program is designed to encourage an account executive's productivity and, thereby, his profitability to DWR. Any extraordinary expenses or costs relative to any transaction would, of course, reduce the profitability of that transaction.

At the end of each month, Costello and other account

executives received a production summary which set forth the gross revenues generated by the executive, the transactions he had engaged in and any extraordinary expenses incurred in connection with those transactions. A yearly report which summarized the same data was also sent to account executives.

Three categories of "deductions", which reduced his over-all compensation by $2,459, are challenged by Costello. Those categories are: (1) margin extensions; (2) long-distance telephone calls; and (3) losses due to errors.

A margin extension interest charge followed when a client of Costello's failed to pay for a stock purchase in a cash account within seven business days as required under regulation T of the Federal Reserve Board (12 CFR 220.4 [c] [2]). Where a client failed to pay on time, DWR was required, under regulation T, either to liquidate the purchase (12 CFR 220.4 [c] [2]), or to obtain an extension of time from a national securities exchange designated by the Federal Reserve Board for that purpose (12 CFR 220.4 [c] [6]). During the extension period, DWR was not relieved of its contractual obligation to the seller of the securities in question, but was required to pay the full purchase price to him and on time. Thus DWR was required to advance its client's purchase price. DWR received no interest from its client on this involuntary loan, unlike loans extended by brokers to margin account customers. There was also no reimbursement for expenses incurred in securing an extension.

Margin extension interest charges represent additional cost in regard to cash accounts. Account executives are, therefore, expected to determine whether customers are able and willing to pay cash. Expenses incurred because of margin extensions were charged against account executives' incentive compensation. In Costello's case, his actual incentive compensation was reduced by a total of $249.67 due to margin extensions in his five years with DWR.

Account executives' incentive compensation was also affected by toll call charges. In Costello's case, DWR agreed to a flat monthly charge of $75, no matter how many long-distance calls he made or accepted collect. The $75 charge led to an actual impact of $25 on Costello's incentive earnings. The total impact of toll call charges on Costello's incentive compensation during his five years with DWR amounted to $1,363.91.

DWR asserts that it encouraged account executives to serve clients located near their branch offices. It maintains that the long-distance telephone charge was a natural corollary of that policy.

An account executive's adjusted compensation could also be affected by certain "error" charges. Errors were charged only where there were repeated errors. Costello's incentive compensation was affected to the extent of $845.90 over his DWR career because of such errors.

Costello complained to the Commissioner that the deductions subtracted by DWR from his compensation were violative of section 193 of the Labor Law. That section, in pertinent part, provides:

"§ 193. Deductions from wages.

"1. No employer shall make any deduction from the wages of an employee, except deductions which:

"a. are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency; or

"b. are expressly authorized in writing by the employee and are for the benefit of the employee; provided that such authorization is kept on file on the employer's premises. Such authorized deductions shall be limited to payments for insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues or assessments to a labor organization, and similar payments for the benefit of the employee.

"2. No employer shall make any charge against wages, or require an employee to make any payment by separate transaction unless such charge or payment is permitted as a deduction from wages under the provisions of subdivision one of this section."

On May 9, 1978 the Commissioner issued an order concerning DWR's practice of deducting charges for extensions, telephone calls and errors from Costello's compensation. The order stated:

"Upon investigation the Industrial Commissioner FINDS:
* * *

"2. The employer made deductions from wages (commissions) earned by the employee in the amounts shown for the periods designated in the attached Schedule of Unlawful

Deductions contrary to the provisions of section 193 subdivision 1 of the New York State Labor Law. These unlawful deductions included charges for office telephone service, extensions (late payment by customers), and errors * * *

"2. The employer also has made similar deductions from the wages of other employees contrary to the provisions of Section 193 subdivision 1 of the New York State Labor Law.

"NOW THEREFORE, IT IS ORDERED:

"1. That payment of $2,459.48 be made to the Industrial Commissioner to be disbursed according to law. Checks should be made payable to the Industrial Commissioner.

"2. That the practice of making unlawful deductions from wages for charges described above be discontinued immediately."

On July 10, 1978 DWR appealed to the Board on the ground that Costello was not an employee protected by section 193 of the Labor Law. DWR also asserted that the deductions had not been made from "wages" within the meaning of section 193.

A *de novo* statutory hearing was held on September 20, 1978 to review the order of the Commissioner. On November 29, 1978 the order of the Board was issued, which affirmed the order of the Commissioner in its entirety.

The Board, in its decision, found that salary and incentive compensation constituted "wages" and that Costello was an "employee" within the meaning of section 193. The Board found that Costello was not an entrepreneur or person engaged primarily in trading for his own account and further found that he did not have significant supervisory responsibilities. The order of the Board is now before us.

One question is presented on review: Did the administrative determination under consideration have a rational basis?

Relevant to our discussion in addition to section 193 are various other sections of article 6 of the Labor Law, as follows:

"§ 190. Definitions.

"As used in this article:

"1. 'Wages' means the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis * * *

"2. 'Employee' means any person employed for hire by an employer in any employment.

"3. 'Employer' includes any person, corporation or association employing any individual in any occupation, industry, trade, business or service * * *

"6. 'Commission salesman' means any employee whose principal activity is the selling of any goods, wares, merchandise, services, real estate, securities, insurance or any article or thing and whose earnings are based in whole or in part on commissions. The term 'commission salesman' does not include an employee whose principal activity is of a supervisory, managerial, executive or administrative nature."

DWR concedes that Costello was an employee of DWR during the period covered by the order. DWR maintains, however, that Costello was not an employee to whom section 193 applies. It argues that Costello was a commission salesman whose activity in the sale of securities was principally executive or administrative, that the exception in subdivision 6 of section 190 which provides that "[t]he term 'commission salesman' does not include an employee whose principal activity is of a supervisory, managerial, executive or administrative nature" excludes this category of employeees from the definition of "commission salesman" and that, accordingly, he was not an employee within the meaning of the term "employee" as used in section 193 of the Labor Law. Thus, DWR contends, section 193 is inapplicable to Costello. Petitioner asserts, further, that the deductions at issue were not made from wages within the meaning of the term "wages" as used in section 193.

Respondents, on the other hand, maintain that section 193 prohibits deductions from wages of an employee except as specified therein,[1] that for the purpose of the various sections in article 6 of the Labor Law an employee is defined in subdivision 2 of section 190 as "any person employed for hire by an employer in any employment" and wages are defined in subdivision 1 of section 190 as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis" and that, therefore, Costello was an employee within the meaning of that term as used in section

---

1. There is no dispute that the exceptions specified in section 193 (subd 1, pars a, b) of the Labor Law are not involved.

193 and the deductions were made from his wages as that term is used in section 193.

In support of its position that Costello is excluded from coverage under section 193 of the Labor Law, petitioner cites *Conticommodity Servs. v Haltmier* (67 AD2d 480). In that case, it was found that an account representative acted in an executive or administrative capacity and therefore came within the exception in subdivision 6 of section 190 of the Labor Law, so that deductions from his compensation could not be considered a violation of section 193 of the Labor Law. The Appellate Division, Second Department, stated: "[D]efendant's duties as an account representative with the plaintiff involved the exercise of independent judgment in determining for himself which customers to solicit and the extent to which he should advise them and accept their order to 'buy' and 'sell.' As such, he acted in an administrative or executive capacity, so that his terms of employment cannot be considered in violation of section 193 of the Labor Law (see exception in Labor Law, § 190, subd 6)." *(Conticommodity Servs. v Haltmier, supra,* p 482.)

Here, similar to the account representative in *Conticommodity (supra),* Costello as an account executive exercised "independent judgment in determining for himself which customers to solicit and the extent to which he should advise them and accept their order to 'buy' and 'sell.'" The difference between the two situations is that in *Conticommodity (supra)* the account representative assumed the "risk of loss" *(East Coast Inds. v Becconsall,* 60 Misc 2d 84, 86) whereas Costello did not, except perhaps to the very limited extent of "margin extension interest charges" and "losses due to errors" heretofore described.

If our determination were to rest solely upon an analysis of the risks undertaken by an account executive and whether he functions in a supervisory, managerial, administrative or executive capacity, we would be compelled, as the dissent argues, to yield to the interpretation of respondents, the agency charged with the responsibility of administering the statute (see *Matter of Great Lakes Dredge & Dock Co. v Department of Taxation & Fin. of State of N. Y.,* 39 NY2d 75, 78-79), that Costello as an account executive was "the type of employee * * * [who] falls within the category of those entitled to be

protected by section 193 of the Labor Law (see dissenting opn herein).[2]

■ ■ While there is a rational basis for so much of the administrative determination as concluded that Costello was an employee entitled to the protection of section 193, this is not true of its conclusion that the subject deductions were from wages. The term "wages," despite its broad definition (Labor Law, § 190, subd 1) does not encompass an incentive compensation plan.

The salary arrangements with Costello embraced an incentive compensation plan. Not only did Costello receive a fixed monthly salary that was unaffected by his rate of productivity and the quality of his performance during any given month, but in addition, he was eligible to receive incentive compensation based on his productivity and the quality of his performance during the month. These quality control requirements were designed to assure the absence of credit extensions in customers' cash accounts, the absence of other extraordinary expenses such as long-distance calls to clients outside the territory of the branch office and the absence of errors. The exhibits in the record establish that the "incentive pay" did not become earned until the end of the production period. In other words, Costello had no vested interest in the additional compensation until the end of the production period, when all appropriate adjustments were made in conformity with the incentive production plan.

During the life of an "incentive compensation" plan "the earning of incentive pay is conditional upon the employee group exceeding the normal rate of output of the required quality for the entire month. It is quite possible that the increased production attained in the first weeks of the period might be offset by the decreased production occurring in the last week of such period and thus no incentive pay would be earned therein. Therefore, the incentive pay does not become earned * * * until the end of the production period" (1950 Opns Atty Gen 169).

The determination of the Board, which affirmed the order of the Commissioner did not deny DWR the right to have an incentive compensation plan but, rather, denied DWR the right to place certain control factors in the plan.

---

2. Furthermore, *Conticommodity (supra)* was decided in the context of a mortgage foreclosure suit, while our review is a proceeding under CPLR article 78.

This was an arbitrary conclusion which is without a rational foundation in the record, inasmuch as the additional compensation amounts due Costello under the plan could not be established until the deductions were made. It was not until that time that the amounts due were determined. In simple terms, it was the net figure to which he was entitled.

■ We hold, therefore, on the record before us, that respondents applied the definition of the term "wages" prematurely in construing the control factors in the incentive compensation plan.

Accordingly, the order of the Industrial Board of Appeals of the Department of Labor dated November 29, 1978, should be annulled, on the law, without costs or disbursements, the petition granted, and the matter remanded to the Board for further proceedings not inconsistent with the opinion of this court.

SILVERMAN, J. (dissenting). I would confirm the determination of the Industrial Board of Appeals, Department of Labor.

The case presents questions of whether the type of employee here involved falls within the category of those entitled to be protected by section 193 of the Labor Law, and whether the deductions made by the employer are of the type forbidden by section 193 of the Labor Law or whether they are merely a permissible step in the calculation of incentive compensation such as might be appropriate if, for example, the employee were entitled to a percentage of net profits from certain customers. On both aspects of the case, the statute and its definitions are certainly broad enough to support the Industrial Board's determination. At most what is involved is drawing a line to exclude the kinds of situations which do not violate the general spirit and intent of the statute, notwithstanding the broad language of the statute, and to include the situations and practices which should be forbidden. Such a drawing of a line in arguable situations is pre-eminently the task of the administrative agency to which the administration of the law is confided. I cannot say that the determination of the administrative agency in this case is without rational basis.

MURPHY, P. J., KUPFERMAN and ROSS, JJ., concur with BIRNS, J.; SILVERMAN, J., dissents in an opinion.

bursements, and the matter remanded to the Industrial Board of Appeals for further proceedings not inconsistent with the opinion of this court. The application of the Association of Investment Brokers for leave to file a brief as *amicus curiae* is granted.